1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

7

8  | UNITED STATES OF AMERICA,

9  |        Plaintiff,

10 |     v.

11 | $318,360.00 in United States Currency,

12 |        Defendant.

3:19-CV-393-LRH-CLB

**Default Judgment of Forfeiture and Final Judgment of Forfeiture**

13 **I. FACTS**

14       On February 7, 2019, at approximately 11:30 A.M., Roger Michael Kelley was

15 driving a 2015 dark gray Dodge Ram pickup truck bearing an Iowa license plate on

16 Interstate 80 westbound in Washoe County, Nevada. Kelley was the sole occupant of the

17 vehicle.

18       An NHP officer radar tracked the Ram traveling at seventy-four miles per hour in a

19 sixty-five-mile-per-hour zone. The officer also observed the Ram change lanes in front of

20 another vehicle, leaving approximately one second of following distance between the Ram

21 and the other vehicle.

22       The NHP officer initiated a traffic stop for the following violations of Nevada law:

23 speeding and unsafe lane change.

24       The NHP officer approached the Ram, made contact with Kelley, and advised

25 Kelley of the reasons for the traffic stop. The officer observed that the Ram's truck bed,

26 which had a hard-top cover, was empty. When the officer asked Kelley where he was

27 headed, Kelley replied that he was traveling to Oregon for a week.

28 *///*

The NHP officer requested that Kelley provide his driver's license and vehicle registration. The officer identified Kelley through the documents that Kelley provided. Kelley's home address was listed as being in Cedar Rapids, Iowa.

The NHP officer asked Kelley to exit the vehicle to continue their conversation while the officer completed a records check. The officer inquired about where in Oregon Kelley was headed. Kelley replied that his destination was the "southern part" of Oregon, specifically "Portland." Portland is located in northern Oregon. The most-direct routes from Cedar Rapids to Portland are each approximately 1,900 miles, and neither route passes through Nevada. Traveling from Cedar Rapids to Portland through the area of Nevada where the officer pulled Kelley over would add over 200 miles to the trip.

The NHP officer submitted Kelley's information for a records check. While awaiting the results, the officer engaged Kelley in conversation.

The NHP officer asked Kelley whether there were any items in the vehicle of which the officer should be aware. Kelley initially replied in the negative. After being asked specifically about illegal drugs and large amounts of United States currency, Kelley stated that there was a small amount of marijuana in the Ram but no large amounts of money.

The NHP officer asked Kelley for consent to search his vehicle, and Kelley verbally consented. While Kelley reviewed a consent-to-search form, two other NHP officers arrived on scene to support the lead officer. They arrived approximately fifteen minutes after the initiation of the traffic stop.

After reading the consent-to-search form, Kelley stated that he did not want investigators to search his vehicle.

At that time, one of the backup NHP officers deployed his certified, reliable canine—trained to detect the odor of illegal drugs. The canine alerted to the presence of the odor of illegal drugs coming from the passenger side of the Ram.

Based on the positive alert, investigators began searching the Ram.

The lead NHP officer discovered numerous bundles of United States currency in a backpack located on the front passenger seat of the Ram. The currency was organized into

small bundles held together with variously colored rubber bands. The smaller bundles were grouped together to form larger bundles, held together with additional rubber bands. The officer found all but one of the bundles of currency in a worn paper shopping bag within the backpack. The officer located the remaining bundle in a separate pocket of the backpack.

The lead NHP officer halted his search and engaged Kelley in conversation, completing a currency-seizure questionnaire.

On February 7, 2019, at approximately 12:04 P.M.—while the lead NHP officer completed the currency-seizure questionnaire with Kelley—an officer from the Washoe County Sheriff's Office (WCSO) arrived on scene to provide support to the NHP officers.

One of the NHP officers placed the two groups of United States currency from the backpack along the road in the brush (the larger amount found in the shopping bag in one spot and the single bundle in another spot). The WCSO officer, who had not seen where the currency was placed, deployed his certified, reliable canine—trained to detect the odor of illegal drugs. The canine was a different canine than the canine that had been deployed in the vicinity of the Ram. The canine found the two groups of currency and alerted to the presence of the odor of illegal drugs coming from both. Shortly afterward, the WCSO officer left the scene to attend to another investigatory matter.

Meanwhile, the lead NHP officer, who was completing the currency-seizure questionnaire with Kelley, asked Kelley whether there were any drugs in the Ram—including "recreational, personal-use marijuana." Kelley now responded in the negative.

When the NHP officer asked Kelley whether there were any large quantities of United States currency in "any" of his bags, Kelley only identified the money found in his "book bag." Investigators who were completing the search of the Ram found another large cache of currency in a new duffel bag, as detailed below.

When the NHP officer asked Kelley how many times he had traveled west in the past five years, Kelley stated: "This summer I went to Yellowstone." When the officer questioned Kelley about whether that was his only trip to the west in the last five years,

3

Kelly responded in the affirmative. As detailed below, the backup NHP officers searching the Ram found a December 26, 2018 receipt from Wal-Mart in Cheyenne, Wyoming for, among other items, a duffel bag.

When the NHP officer asked Kelley to provide further information about the United States currency, Kelley stated: (a) Kelley was saving the currency to make a down payment on a home; (b) Kelley had been saving the money for the past ten years; (c) the source of the currency was from employment ; (d) the amount of currency in the backpack was approximately $40,000; and (e) Kelley kept a large amount of cash on hand when he traveled because (1) his home had been burglarized in the past and (2) he was following a money-saving program that involved putting aside sums of cash in particular increments. A later official bank count determined that the currency found in the backpack totaled $47,000.

When the NHP officer asked Kelley about why the canine had alerted to the presence of illegal drugs, Kelley stated that he had been storing his personal-use marijuana in the backpack.

When the NHP officer asked Kelley about his maintenance of bank accounts, Kelley acknowledged that he owned two checking and two savings accounts with Veridian Credit Union, one account with U.S. Bank, a debit card, and a credit card. The search of the Ram uncovered a bank card, a debit card, a credit card, and numerous bank-account statements showing account activity. When Kelley later submitted his administrative claim, he asserted that he kept the money on his person in the form of cash because he did "not trust the banking system."

While completing the currency-seizure questionnaire with Kelley, the NHP officer learned from one of his colleagues that another large cache of United States currency had been discovered in a duffel bag in the Ram.

Investigators found the second cache of United States currency in a new duffel bag (its tag was still attached). Specifically, investigators located large black garbage bags with their tops tied off, which were packed into a separately zippered sub-compartment

4

underneath the duffel bag's main compartment. Within the black garbage bags, the money was organized into smaller rubber-banded bundles that, in turn, were grouped together into bigger rubber-banded bundles. Additionally, some of the currency bundles within the black garbage bags were further bagged, variously, inside opaque white and transparent plastic bags, also tied off.

When asked about the United States currency in the duffel bag, Kelley stated that it totaled "roughly" $100,000 and that the combined currency found in the Ram amounted to "150 plus." When the officer sought clarification, Kelley said that the entirety of the cash "might" total $250,000. A later bank count determined that the duffel bag contained $271,360 in currency and that the entirety of the bundled currency in Kelley's vehicle totaled $318,360.

One of the NHP officers placed the United States currency from the duffel bag along the road in the brush. The lead NHP officer, who had not seen where the currency was placed, deployed his certified, reliable canine—trained to detect the odor of illegal drugs. The canine was a different canine than the two canines that had alerted to the Ram and the currency found in the backpack, respectively. The canine found the currency and alerted to the presence of the odor of illegal drugs coming from it.

In addition to the United States currency, investigators found additional items in the Ram, including: (a) two twenty-five-pack boxes of Ostrich Bags—heavy-duty transparent bags labeled for use for kitchen, garden, preservation, freezing, and home applications and fitted for thirty-gallon drums; (b) a large roll of opaque black plastic garbage bags; (c) a credit and debit card in Kelley's name; (d) numerous Veridian Credit Union account statements, showing account balances; (e) a Veridian Credit Union bank card in Kelley's name; (f) a 2018 W-2 from PMX Industries, Inc. showing Kelley's taxable annual income as $64,867.73;  (g) numerous folded moving blankets, variously located in the back seat of the Ram and in the duffel bag; (h) a December 26, 2018 receipt from Wal-Mart in Cheyenne, Wyoming for, among other items, a duffel bag; and (i) paperwork showing Kelley's January 15, 2019 financed purchase of the Ram, with a price of $26,845.

A later official bank count determined that the United States currency totaled $318,360. The currency was composed of the following: (a) $24,100 in $100 bills (241 bills); (b) $10,400 in $50 bills (244 bills); (c) $278,200 in $20 bills (13,910 bills); (d) $3,630 in $10 bills (363 bills); (e) $2,015 in $5 bills (403 bills); and (f) $15 in $1 bills (15 bills). For each of the two corpuses of money (the currency found in the backpack and the duffel bag, respectively), $20 bills comprised the vast majority of the currency; approximately 93% of the bills in the backpack were $20 bills, and approximately 92% of the bills in the duffel bag were $20 bills.

At the conclusion of the traffic stop, investigators seized the United States currency. On February 27, 2019, the NHP transferred a check for the currency to the DEA.

The $318,360.00 in United States currency is the entirety of the defendant currency.

## II. PROCEDURE

On July 11, 2019, the United States filed a verified Complaint for Forfeiture in Rem, ECF No. 1, alleging the $318,360 (defendant property):

    a.  is all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, et seq., and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

    b.  is all proceeds traceable to all moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance or listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, et seq., and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

    c.  is all moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, et seq., and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

On August 16, 2019, the Court entered an Order for Summons and Warrant of Arrest in Rem for the Property and Notice, ECF No. 3, and the Clerk issued the Summons and Warrant of Arrest in Rem, ECF No. 4.

Pursuant to the Order, ECF No. 3, the following documents were served on the defendant property and all persons or entities who may claim an interest in the defendant property: the Complaint, ECF No. 1, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, ECF No. 3, the Summons and Warrant of Arrest in Rem for the Property, ECF No. 4, and the Notice of Complaint for Forfeiture and Arrest. Notice was published according to law.

Pursuant to Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (Fed. R. Civ. P. Supp. Rule) G(5), all persons interested in the defendant property were required to: (1) file a verified claim, setting forth the person's or its interest in the property, that (a) identified the specific property claimed, (b) identified the claimant and stated the claimant's interest in the property, and (c) was signed by the claimant under penalty of perjury pursuant to 28 U.S.C. § 1746; (2) file the verified claim with the Clerk of the above-entitled Court no later than 35 days after the notice was sent or, if direct notice was not sent, no later than 60 days after the first day of publication on the official internet government forfeiture site, www.forfeiture.gov; (3) file an answer to the Complaint for Forfeiture in Rem or a motion under Rule 12 with the Clerk of the Court, Bruce R. Thompson U.S. Courthouse and Federal Building, 400 South Virginia Street, 3rd Floor, Reno, Nevada 89501, no later than 21 days after filing the verified claim; and (4) serve a copy of the verified claim and the answer at the time of each filing on James A. Blum, Assistant United States Attorney, 501 Las Vegas Boulevard South, Suite 1100, Las Vegas, Nevada 89101. Complaint, ECF No. 1; Order for Summons and Warrant, ECF No. 3; Summons and Warrant, ECF No. 4; Notice of Complaint, ECF No. 13, p. 5-6.

On August 27, 2019, the United States Marshals Service served the Complaint, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of Complaint for

Forfeiture and Arrest by executing them on the defendant property. Notice of Filing Service of Process, ECF No. 5.

Public notice of the forfeiture action and arrest was given to all persons and entities by publication via the official internet government forfeiture site, www.forfeiture.gov, from August 23, 2019, through September 21, 2019. Notice of Filing Proof of Publication, ECF No. 12.

On August 27, 2019, the United States Attorney's Office served the Complaint, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of Complaint for Forfeiture and Arrest on Roger Michael Kelley by certified return receipt mail and regular mail. Notice of Filing Service of Process, ECF No. 13-1, p. 3-24, 26-28, 32.

On August 27, 2019, the United States Attorney's Office served the Complaint, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of Complaint for Forfeiture and Arrest on Roger M. O'Donnell, Esq., Joey Gilbert Law, Counsel for Roger Michael Kelley, by certified return receipt mail and regular mail. Notice of Filing Service of Process, ECF No. 13-1, p. 3-24, 29-32.

On October 1, 2019, Roger Michael Kelley filed a verified claim. Claim, ECF No. 6.

On November 19, 2019, the United States filed a Settlement Agreement for Entry of Judgment of Forfeiture as to Roger Michael Kelley and Order, regarding the $318,360. Claimant waived, among other things, service of process. Settlement Agreement, ECF No. 15.

On January 22, 2020, the Court entered the Order granting the Settlement Agreement for Entry of Judgment of Forfeiture as to Claimant and Order. Order Granting Settlement Agreement, ECF No. 17.

No other person or entity has filed a claim, answer, or responsive pleading within the time permitted by 18 U.S.C. § 983(a)(4) and Fed. R. Civ. P. Supp. Rule G(4) and (5).

Roger Michael Kelley is not in the military service within the purview of the Servicemembers Civil Relief Act. Exhibit 1.

Roger Michael Kelley is neither a minor nor an incompetent person.

On February 3, 2020, the United States filed a Motion for Entry of Clerk's Default against the $318,360 and all persons or entities who may claim an interest in the defendant property in the above-entitled action. Motion for Entry of Clerk's Default, ECF No. 18.

On February 4, 2020, the Clerk of the Court entered a Default against the $318,360 and all persons or entities who may claim an interest in the defendant property in the above-entitled action. Entry of Clerk's Default, ECF No. 19.

## III. The Requirements for Default were met.

### A. Legal Standard

Civil forfeiture cases have five requirements that must be fulfilled to complete a default: (1) the judgment sought does not differ in kind from, or exceed in amount, what is demanded in the pleadings pursuant to Fed. R. Civ. P. 54(c); (2) the Clerk of the Court has entered default for a sum certain pursuant to Fed. R. Civ. P. 55(b)(1); (3) publication and personal service were completed pursuant to Fed. R. Civ. P. Supp. Rule G(4); (4) the complaint is legally sufficient to support a reasonable belief that the government will be able to meet its burden of proof pursuant to Fed. R. Civ. P. Supp. Rule G(2), *Alan Neuman Prods., Inc. v. Albright,* 862 F.2d 1388, 1392 (9th Cir. 1988); and (5) no person has filed a claim, or the claim(s) have been resolved under 18 U.S.C. § 983(a)(4)(A) or Fed. R. Civ. P. Supp. Rule G(5).

Civil cases that do not directly address forfeiture have seven factors that the Court must consider before entry of default: (1) the substantive merit of the plaintiff's claims; (2) the sufficiency of the complaint; (3) the amount of money at stake; (4) the possibility of prejudice to the plaintiff if relief is denied; (5) the possibility of disputes to any material facts in the case; (6) whether default resulted from excusable neglect; and (7) the public policy favoring resolution of cases on the merits. *Eitel v. McCool,* 782 F.2d 1470, 1471-72 (9th Cir. 1986); *SATA GmbH & Co. KG v. USA Italco Int'l Ltd.*, No. 3:18-CV-00351-MMD-

9

WGC, 2019 WL 4601513, at *3 (D. Nev. Sept. 20, 2019); *Covenant Care California, LLC v. Shirk*, No. 217CV00956JADVCF, 2018 WL 3429669, at *1 (D. Nev. July 16, 2018).

For purposes of a default judgment, the well-pled allegations of the complaint are taken as true. *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 918 (9th Cir. 1987). Furthermore, upon default, the defendant's liability is conclusively established and the factual allegations in the complaint, except those relating to damages, are accepted as true. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). The power to grant or deny relief upon an application for default judgment is within the discretion of the Court. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

**B.  The Forfeiture Requirements for Default Were Met.**

a.  Judgment Sought

Pursuant to Fed. R. Civ. P. 54(c) and 55(b), the judgment by default does not "differ in kind from, or exceed [the] amount" of relief listed in the complaint for forfeiture

b.  Default and Entry of Default

As shown above, the United States requested entry of Clerk's Default against the $318,360 and all persons or entities who may claim an interest in the defendant property in the above-entitled action. ECF No. 18. The Clerk entered the Default as requested. ECF No. 19.

c.  Notice

Pursuant to Fed. R. Civ. P. Supp. Rule G(4)(a)(iv)(C), the United States published notice via the official internet government forfeiture site, www.forfeiture.gov, for thirty consecutive days. ECF No. 12. Pursuant to Fed. R. Civ. P. Supp. Rule G(4)(b), the United States served the Complaint, the Order for Summons and Warrant of Arrest in Rem for the Property and Notice, the Summons and Warrant of Arrest in Rem for the Property, and the Notice of Complaint for Forfeiture and Arrest on all known potential claimants. Notice of Filing Service of Process-Mailing, ECF No. 13.

*///*

*///*

d.  <u>Legal Sufficiency of the Complaint</u>

The Complaint filed in this action was verified. The Court has subject matter jurisdiction, in rem jurisdiction over the defendant property, and venue. The Complaint described the property with reasonable particularity. The Complaint states where the seizure of the defendant property occurred and its current location. The Complaint identifies the statute under which the forfeiture action is brought. The Complaint alleges sufficiently detailed facts to support a reasonable belief that the United States will be able to meet its burden of proof at trial. Fed. R. Civ. P. Supp. Rule G(2); Complaint, ECF No. 1.

e.  <u>Status of Potential Claimants</u>

Roger Michael Kelley has entered into a Settlement Agreement with the United States.

No person has filed a claim and answer and the time to file such has passed.

**C.   The Civil Requirements for Default Were Met.**

a.  <u>The Plaintiff Would be Prejudiced Without a Judgment</u>

1.   The government would be prejudiced if it were to try this case rather than obtain a default judgment, since a trial would require the additional expenditure of human and financial resources. These expenses and efforts are unnecessary because the Complaint established sufficient evidence of the status and forfeitability of the defendant property, and that evidence is uncontested by Roger Michael Kelley. *See United States v. $150,990.00 in U.S. Currency*, No. 2-12-CV-01014-JAD, 2014 WL 6065815, at *2 (D. Nev. Nov. 10, 2014), ("[T]he government would be prejudiced by having to expend additional resources litigating an action that appears to be uncontested. This factor favors default judgment.")

b.  & c. <u>The Government's Claims are Meritorious and the Complaint is Sufficient.</u>

2.   As shown in the statement of the case above, the government has a clear case against the defendant property and the Complaint sufficiently alleges the facts of the case.

/ / /

/ / /

1

        d.  <u>The Amount of Money at Stake</u>

2

      3.  The value of the property at stake was clearly established in the Complaint, ECF

3

No. 1, and the defendant property is forfeitable pursuant to 21 U.S.C. § 881(a)(6).

4

> Under the fourth *Eitel* factor, the court considers the amount of money at stake

5

> in relation to the seriousness of Defendants' conduct. Plaintiff has provided
> evidence that the currency, a sum of $24,000, was furnished or intended to be
> furnished in exchange for marijuana, a serious violation of federal law.

6

7

> *United States v. Twenty-Four Thousand Dollars ($24,000) in U.S. Currency*, No.
> 02:09-CV-2319-LRH, 2010 WL 2695637, at *3 (D. Nev. July 2, 2010)
> (quotation marks and citation omitted).

8

9

The Complaint alleges the serious crime of exchanging or intending to exchange moneys,

10

negotiable instruments, securities, or other things of value for a controlled substance or

11

listed chemical in violation of Subchapter I of the Controlled Substances Act, 21 U.S.C. §

12

801, *et seq*. The money at stake is the tainted currency related to a completed or

13

contemplated illegal-drugs transaction in violation of Subchapter I of the Controlled

14

Substances Act, 21 U.S.C. § 801, *et seq*.

15

        e.  <u>There Are No Possible Disputes of Material Fact</u>

16

      4.     No issues of material fact exist and the allegations of the Complaint are

17

established as a matter of law. The property is subject to forfeiture because law enforcement

18

can demonstrate that the defendant property:

19

          a.  is all moneys, negotiable instruments, securities, or other things of

20

            value furnished or intended to be furnished in exchange for a

21

            controlled substance or listed chemical in violation of Subchapter I

22

            of the Controlled Substances Act, 21 U.S.C. § 801, et seq., and is

23

            subject to forfeiture to the United States pursuant to 21 U.S.C. §

24

            881(a)(6).

25

          b.  is all proceeds traceable to all moneys, negotiable instruments,

26

            securities, or other things of value furnished or intended to be

27

            furnished in exchange for a controlled substance or listed chemical in

28

            violation of Subchapter I of the Controlled Substances Act, 21

12

U.S.C. §801, et seq., and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

   c.  is all moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of Subchapter I of the Controlled Substances Act, 21 U.S.C. § 801, et seq., and is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

   f.  <u>Default Was Not the Result of Excusable Neglect</u>

5.  The record shows that the claimant was properly served with the Complaint, Order, Summons and Warrant, and the Notice and filed a claim. Roger Michael Kelley entered into a settlement agreement. There is no evidence of excusable neglect.

   g.  <u>Public Policy Does not Prevent Default Judgment</u>

6.  Under Fed. R. Civ. P. 55(b), default judgments are allowed. Here, the potential claimant entered into a Settlement Agreement.

> While the Federal Rules do favor decisions on the merits, they also frequently permit termination of cases before the court reaches the merits. As F.R.C.P. 55 indicates, one such instance is when a party fails to defend against an action, which is exactly what [claimants] failed to do in this case. Thus, the preference to decide cases on the merits does not preclude a court from granting default judgment.
>
> *Kloepping v. Fireman's Fund*, No. C 94-2684 TEH, 1996 WL 75314, at *3 (N.D. Cal. Feb. 13, 1996) (brackets added).

Denying the government's motion would not further public policy. While cases should be decided on the merits when possible, the claimant has not contested the facts of the Complaint or the forfeiture of the defendant property, which makes a decision on the merits impractical. Therefore, a final default judgment of forfeiture is appropriate. *See Covenant Care California*, 2018 WL 3429669, at *2.

**IV. Judgment**

Based on the foregoing this Court finds that the United States has shown its entitlement to a Default Judgment of Forfeiture as to all persons or entities who may claim an interest in the defendant property and Final Judgment of Forfeiture as to $318,360 and Roger Michael Kelley.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Default Judgment of Forfeiture is entered against all persons or entities who may claim an interest in the defendant property in the above-entitled action.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Final Judgment of Forfeiture is entered against the $318,360.00 in United States Currency and Roger Michael Kelley.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the defendant property be, and the same is hereby forfeited to the United States of America, and no possessory rights, ownership rights, and no rights, titles, or interests in the property shall exist in any other party.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that the United States release to Roger Michael Kelley one payment of $60,000 less any debt owed to the United States, any agency of the United States, or any debt in which the United States is authorized to collect, through James A. Blum.

IT IS HEREBY CERTIFIED, pursuant to 28 U.S.C. § 2465(a)(2), that there was reasonable cause for the seizure or arrest of the defendant property.



4/16/2020

CLERK OF COURT

Date: _____

_____
Signature of Clerk or Deputy Clerk